Mark Poe (S.B. #223714) – mpoe@gawpoe.com
Randolph Gaw (S.B. #223718) – rgaw@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff Super Cray Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUPER CRAY INC.<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC.<br><br>Defendant. | Case No.<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Super Cray Inc. ("Super Cray") hereby makes the following allegations:

1. Super Cray is the publisher of a popular entertainment website called SuperCrayCray (www.supercraycray.com). It entered into an agreement with defendant Google Inc. ("Google") to publish Google's AdSense advertisements on SuperCrayCray.

2. Super Cray fully complied with the requirements of the AdSense program when displaying Google's advertisements. On multiple occasions, Super Cray reached out to Google AdSense representatives by e-mail and Google's Internet chat program for confirmation that Super Cray's ad placements on SuperCrayCray were valid and conformed to all AdSense policies, including those policies designed to ensure that the layout of AdSense advertisements did not encourage "accidental clicks." Super Cray received written confirmation on each of those occasions from Google that everything was done in accordance with AdSense's terms of service.

3. Encouraged by Google's written confirmations, Super Cray invested significant sums of money – over $300,000 – to accelerate the monetization of SuperCrayCray. Specifically, Super Cray spent such money to have SuperCrayCray and its articles prominently placed and displayed on various popular Internet websites, such as Facebook. With such placement, user traffic to SuperCrayCray surged and many more users were exposed to Google's advertisements on that website.

4. According to Super Cray's account records with Google AdSense, by October 21, 2014, Super Cray had accrued $535,000 in earnings under Google AdSense. But on that day, which was supposed to be same day that Google would pay out all earnings under the AdSense program to its participants, Google instead notified Super Cray that its AdSense account had been suspended because its advertising layout "encourages accidental clicks."

5. Super Cray has attempted to appeal Google's decision but Google's representatives refuse to have any in-depth, substantive discussions regarding the purported deficiencies of SuperCrayCray and refuse to acknowledge the prior actions of Google representatives that had led Super Cray to believe it was fully complying with AdSense's requirements.

6. Google's lack of response is not surprising, however, in light of growing reports that Google systemically suspends and withholds payment on high-earning AdSense accounts for arbitrary and capricious reasons, typically right before payouts on such earnings are due. Such reports indicate that Google pockets those withheld earnings for itself, thereby improving its own financial results at the expense of publishers like Super Cray.

**PARTIES**

7. Plaintiff Super Cray Inc. is a New York corporation that has its principal place of business in New York.

8. Defendant Google Inc. is a Delaware corporation that has its principal place of business in California.

## JURISDICTIONAL STATEMENT

9. The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are all citizens of different states and the amount in controversy exceeds $75,000.

10. The Court has personal jurisdiction over Google because it transacts business in California and because in the Google AdSense Online Terms of Service, it expressly consents to personal jurisdiction in this Court.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google resides and regularly conducts business in this district.

## INTRADISTRICT ASSIGNMENT

12. Google's headquarters is located in Mountain View, California, and therefore assignment to the San Jose division of this Court is appropriate.

## FACTUAL ALLEGATIONS

### *Background on AdSense*

13. Google is the largest online marketing/advertising business in the world. The AdWords Advertising Program ("AdWords") is Google's primary advertising program. AdWord advertisements are displayed in a variety of formats such as text and/or images, alongside or above search results, on webpages, in e-mails, on blogs, and/or in videos.

14. The Google AdSense Content program enables online publishers of websites to partner with Google to earn revenue from AdWords advertisements displayed on websites under their ownership, license, registration and/or other control. Google tracks each time Internet users click on advertisements displayed on AdSense publishers' websites and charges advertisers for each click. Google pays the AdSense publishers a portion of the amount paid by advertisers for the clicks, while retaining the remaining portion for itself.

15. According to Google, publishers participating in the AdSense Content program are promised a 68% revenue share. (https://support.google.com/adsense/answer/180195?hl=en). Furthermore, Google touts the superiority of its on-line advertising program against programs offered by competitors, as it stated "Another ad network might offer an 80% revenue share, but only collect $50 from advertisers, so you'd receive $40. With the vast number of advertisers

competing to appear on AdSense sites, our system ensures that you're earning the most possible for every ad impression you receive."

16. The Google AdSense Online Terms of Service ("AdSense Agreement") governs the relationship between website publishers and Google for the AdSense Content program. Google unilaterally drafts all contracts, policies, procedures, and guidelines governing the relationship between Google and AdSense publishers, as well as any and all amendments and modifications.

17. The AdSense Agreement provides the following policies and procedures for payments to publishers:

> **Section 5: Payments**
>
> Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google.
>
> …
>
> Payments will be calculated solely based on our accounting. Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole discretion. Invalid activity is determined by Google in all cases and includes, but is not limited to, (i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above…

18. Further, the AdSense Agreement contains the following policies and procedures for termination or suspension of AdSense publisher accounts:

> **Section 10: Termination**
>
> You may terminate the Agreement at any time by completing the account cancellation process. The Agreement will be considered terminated within 10 business days of Google's receipt of your notice. If you terminate the Agreement and your earned balance equals or exceeds the applicable threshold, we will pay you your earned balance within approximately 90 days after the end of the calendar month in which the Agreement is terminated. Any earned balance below the applicable threshold will remain unpaid.

> Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason. If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account…

19. Under California law, Google is contractually obligated to act in good faith and deal fairly with AdSense publishers in implementing its stated policies and guidelines in the AdSense Agreement.

20. In particular, Google is obligated, pursuant to the terms of Section 5 of the AdSense Agreement, to act in good faith and deal fairly with AdWords publishers in: (a) determining the validity of clicks, impressions, and other activities/events performed in connection with the display of advertisements on the publisher's websites; (b) accounting for the payments owed to publishers under the AdSense Agreement; (c) and withholding payments arising from activity Google deems invalid.

21. Additionally, Google is obligated, pursuant to the terms of Section 10, to act in good faith and deal fairly with AdSense publishers in: (a) suspending or terminating the AdSense Agreement; (b) suspending or terminating the participation of any website in the AdSense program; (c) determining that an AdSense publisher breached the AdSense Agreement; (4) determining that an AdSense publisher engaged in invalid activity; and (5) withholding or charging back payments earned by an AdSense publisher under the AdSense Agreement.

***Background on Super Cray***

22. Super Cray completed an application to participate as a publisher in the Google AdSense program for its SuperCrayCray website.

23. SuperCrayCray is a humorous website with the tagline "Where Ridiculous Meets Entertainment." Its founders spend time assembling photographs in the public domain of celebrities and other famous people and then crafting "lists" and writing original content to provide information about the featured personages designed to amuse the viewer or provoke thoughtful discussion.

24. One example is a post on SuperCrayCray titled "7 Startups You Didn't Know Were Funded By A-List Celebrities," which can be found at http://supercraycray.com/7-startups-

you-didnt-know-were-funded-by-a-list-celebrities/. The post – broken up over several pages in a style similar to other websites such as Buzzfeed or Cracked – features on each page a photograph of a popular celebrity, such as Justin Bieber, Jared Leto, Lady Gaga and Ashton Kutcher. Accompanying each photograph is an explanation of the startup company that counts that celebrity as an early investor – viewers are informed that Justin Lieber is an investor in a photograph-based startup called Shots, Jared Leto is an investor in the recently-acquired-by-Google-for-$3.2 billion startup called Nest, Lady Gaga is an investor in a social network called Backplane and Ashton Kutcher is an investor in Airbnb.

25. Google granted Super Cray's application to participate in the AdSense program and provided it with hypertext mark-up language ("HTML") to insert in SuperCrayCray's source code to display the AdSense advertisements. SuperCray inserted the supplied HTML into SuperCrayCray's source code and the website began displaying targeted advertisements to its viewers through the AdSense program in early September 2014.

26. Substantial time and resources were spent in developing SuperCrayCray and its content for purposes of monetizing the website through advertising.

***Google Affirms SuperCrayCray's Compliance with AdSense Requirements and Policies***

27. SuperCrayCray, and its formatting of Google's AdSense advertisements, complied with all of Google's Ad Placement Policies, which are available to publishers at https://support.google.com/adsense/answer/1346295?hl=en.

28. In particular, SuperCrayCray did not encourage accidental clicks. SuperCrayCray did not display ads in such a way that they might have been mistaken for other website content. SuperCrayCray did not place ads under misleading headers or titles. SuperCrayCray did not use language to encourage users to click on ads. SuperCrayCray did not bring unnecessary or unnatural attention to its ads. SuperCrayCray did not place ads on pages or sites where dynamic content was the primary focus. SuperCrayCray did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads. SuperCrayCray did not place ads on noncontent-based pages. SuperCrayCray did not offer users compensation for clicking ads. SuperCrayCray did not disguise ads on its webpages. SuperCrayCray did not attempt to associate

specific images with individual ads appearing on their sites. SuperCrayCray did not display its content below the fold. SuperCrayCray did not display ads in software applications. SuperCrayCray did not display ads in e-mail messages. SuperCrayCray displayed ads only from Google's AdSense network. SuperCrayCray did not display ads from any other publishers. SuperCrayCray did not display more than the maximum of three standard ad units, three link units, and two search boxes on one webpage. SuperCrayCray did not display ads on password-protected pages. SuperCrayCray websites did not have more than three pop-ups. SuperCrayCray did not display ads in pop-up windows.

29. Furthermore, Google expressly affirmed to Super Cray on multiple occasions that the advertisements it was displaying on its website fully conformed with Google's AdSense policies.

30. Google AdSense allows a publisher to "self-report" its website to Google so that Google could verify that the website was fully compliant with AdSense policies. Publishers might do this because, for example, they see a spike in their click-thru-rate ("CTR") (i.e., the percentage of website viewers that click on advertisements) and want Google to verify that the increased CTR was not due to "click fraud," improper advertisement, website formatting or other factors that could cause Google to find an AdSense advertisement to be invalid.

31. Google encourages publishers to self-report so that those publishers can make any necessary corrections to their website far in advance of the payout date. This benefits Google as well, because advertisers are not likely to pay Google for advertisements that featured an unusually high CTR.

32. On September 29, 2014, Super Cray co-founder Denis Ganev participated in an Internet chat carried out on Google's proprietary chat program with a Google AdSense representative named "Ryan J" after Super Cray had performed a self-report on itself to Google. In that conversation, the parties stated:

> Denis: We reported our selves previously in the month asking to verify if our site is fully complaint (sic) with all TOS [Terms of Service]. We never received a response, does that normally mean that it was checked and no issues were found?

Ryan J: Correct, warnings are resolved once you mark them as such. If there is a future issue the policy team will get back to you.

Denis: Honestly, our biggest concern was our CTR on our ads. We wanted to confirm if it was inline with whats normal. We wanted to double check that the CTR was not in anyway a result of accidental clicks, or what not. Is that something that's checked periodically when a site scales quickly? Or is that something checked in the 2 week period?

Ryan J: We do validate all clicks and impressions and are monitoring it constantly. **The CTR you are seeing is within the normal range. I'm also not seeing any concerns are you site, ex. implementation that could cause a high amount of accidental clicks.**

33. By the end of September 2014, SuperCrayCray had accrued $197,045.69 in AdSense earnings according to Google. That number had been slightly reduced compared to previous figures estimated by Google, so on October 1, 2014, Super Cray co-founder Ryan Kalscheuer contacted Google with questions. In another Internet chat with "Ryan J," Ryan J explained that the estimated earnings had been reduced compared to the final earnings because of CTR that Google determined to be invalid. In addition:

Ryan K: Is there any other reason for further adjustments for the month of Sept? Can I count on receiving this amount, $197,045.69 later in the month?

Ryan J: Yes, those earnings have finalized and **will be paid out** on the 21st of the month. Then you will receive it a few days later.

34. Also on October 1, 2014, another Google AdSense representative called "Roy" responded by e-mail to a separate query by Super Cray co-founder Kirill Fuchs. In Kirill's e-mail, he had asked:

Hello,

My question is regarding an ad placement we currently have. Our 336x280 (desktop) and 300x250 (mobile) both have a significant click through rate on the first page of some of our articles. I wanted to verify that our ad placement is not generating invalid activity such as accidental clicks. Is there anyway to tell if our conversion rate for those ads are below normal ranges? Thank you in advance, I understand it's difficult to accommodate every publishers request to verify such things.

An example page would be:
http://supercraycray.com/15celebritiesthatreallyhateeachother/

35. Roy responded:

> Hi Kirill,
>
> Happy to help. I reviewed your account and website supercraycray.com , and found correct implementations for both 336x280 (desktop), and 300x250 (mobile). We definitely appreciate your honesty and your efforts to keep your account in good standing.
>
> For your reference, you can find tips and guidelines for keeping your account in good standing by visiting https://www.google.com/support/adsense/bin/answer.py?answer=23921. Hope this is useful. Feel free to write me for any further clarifications.
>
> Thanks,
>
> Roy
> The Google AdSense Team

36. Attached as Exhibit 1 and incorporated by reference in this Complaint is a true and correct copy of the October 1, 2014 e-mail from Roy (adsense-support@google.com) to Kirill which includes Kirill's original e-mail to Google AdSense.

37. On October 6, 2014, Kirill contacted Google with questions regarding SuperCray's declining cost-per-click ("CPC") that it was earning from its AdSense advertisers. In an Internet chat with Google AdSense representative "Jacky G," the parties stated:

> Kirill: We tend to see higher CTR at the bottom of the page. But for some reason the CPC is higher for the first unit of th page. We originally ran the 300x250 at the top but switched positions about a week ago since that one has higher CPC.
>
> Jacky G: The ad unit at the top of a page will generally perform better because it's above the fold and users will always see the ad. Ads further down a page are not guaranteed the same visibility. **It's great that you've labeled your ads because this will reduce invalid clicks.** It's also possible that the 300x100 performed better because it doesn't take up as much space. Placing the 300x250 right below the article title would have pushed your content below the fold and likely caused more accidental clicks.
>
> **I'd stick with your current implementation.**
>
> My only suggestion would be to increase the size of your navigation buttons just so they're obvious to your users.
>
> **Actually I just navigated past the first page and the previous and next buttons are bright and obvious.**
>
> **My suggestion would be to keep this implementation** and monitor it's performance over the next few weeks. CPCs should adjust for the change soon and you'll likely start seeing a boost because of the holidays.

38. Encouraged by Google's written confirmations to it on September 29, October 1 and October 6, Super Cray spent over $300,000 having SuperCrayCray and its articles prominently advertised, placed and displayed on websites like Facebook. The idea was to increase user traffic to SuperCrayCray and thus present more viewers to its AdSense advertisements. Assuming that SuperCrayCray's advertisements maintained its 2-3% CTR (the standard for valid Google CTRs being 2-4%), Super Cray would make more money off the increased advertisement revenue than it was spending on acquiring user traffic.

39. In fact, Google encourages publishers to increase their user traffic using such means. As part of its suggested tips regarding site optimization on its Ad Traffic Quality Resource Center, Google states that "[a]cquiring new traffic to your website is another common way to generate increased traffic. Common ways to do this include search engine optimization, **advertising** and **partnering with traffic providers**."

40. Increasing traffic to an AdSense publisher's website, after all, would also result in added revenue to Google itself.

***Google Damages Super Cray***

41. By October 21, 2014, Super Cray's accrued earnings from the AdSense program were $535,000 according to Google. October 21 was also the day Google was supposed to pay out its AdSense revenues to its publishers, as confirmed by Ryan J on October 1.

42. Instead of receiving a payout from Google, however, on October 21, 2014, Super Cray received a notification from Google that its account had been suspended for "Layout Encourages Accidental Clicks." Google refused to pay anything to Super Cray.

43. Super Cray has repeatedly tried to discuss the issue with Google AdSense representatives and point out that Google expressly validated SuperCrayCray's layout on September 29, twice on October 1 and also on October 6.

44. Google, however, has refused to carry on any in-depth substantive discussions with Super Cray and has refused to pay anything despite Super Cray having caused Google to earn over $786,000 in advertising revenue from AdSense.

***Google's Motivations for Defrauding Super Cray***

45. On April 29, 2014, an anonymous whistleblower purporting to be a former Google AdSense employee published on the Internet a detailed exposé about Google's systemic practices in defrauding AdSense publishers (the publication of which can be found at http://pastebin.com/qh6Tta3h).

46. According to this whistleblower, beginning in 2009, Google executives were unhappy with the amount of revenue shared with its AdSense publishers and thus began a process of banning high-earning AdSense accounts close to their payout period (notably bans never took place after payouts were made). Google would pocket all of the AdSense earnings for those banned accounts and thereby eliminate any revenue-sharing whatsoever.

47. According to this whistleblower, Google AdSense employees were instructed to provide any reason for a ban of an account, no matter how unsubstantiated or unprovable the reason could be.

48. According to this whistleblower, certain AdSense accounts were exempted from this practice based on the likelihood that they could generate media attention or public outrage following an arbitrary termination. This meant that nascent publishers, such as Super Cray, were vulnerable because they were not yet sufficiently well-known to attract a dedicated following or significant media attention.

49. In addition to Super Cray, other examples of Google's conduct supporting the whistleblower's account abounds. For example, a former AdSense publisher called PubShare (www.pubshare.com) had accrued nearly $1 million in AdSense earnings when Google abruptly terminated PubShare's account in November 2013 and refused to pay out any amount of that $1 million.

50. Similar to Super Cray, Google provided the following explanation to PubShare for its account termination: "Layout Encourages Accidental Clicks." PubShare, however, displayed its Google AdSense advertisements in a format approved by Google. And similar to Super Cray, Google has refused to have any in-depth, substantive discussions with PubShare regarding its decision to terminate that account.

51. On information and belief, Google AdSense representatives Ryan J, Roy and Jacky G were following internal Google directives to reassure AdSense publishers that their content did not violate any AdSense policies. Having received such reassurances, those publishers would redouble their efforts to drive user traffic to their AdSense advertisements, thereby generating additional AdSense revenue for Google especially after Google would ban those accounts for arbitrary reasons and not engage in any revenue sharing for them.

52. Google has denied the whistleblower's claims, professing that it lacks any motive to improperly confiscate accrued AdSense earnings from a publisher's account. According to Google, when it confiscates those earnings, it credits that money back to the advertisers who had initially paid Google when their ads on the publisher's site were clicked on.

53. Even accepting the truth of the claim, however, it does not remove Google's motivation to illegally confiscate accrued AdSense earnings from publishers. That is because when Google confiscates the funds from the publisher, and credits them back to the advertiser, it effectively (and substantially) lowers that advertiser's cost of advertising, *at the publisher's, not Google's* expense. That is, the advertiser still received the click from the person who was browsing the publisher's site, but did not have to pay for it. Through this process, Google earns substantial goodwill from its advertiser customer base, and obtains a competitive advantage vis-à-vis its competitors in the online advertising business who do not confiscate their publishers' accrued earnings and kick them back to the advertiser.

**FIRST CAUSE OF ACTION**
**(Fraud – Cal. Civ. Code §§ 1709, et seq.)**

54. Super Cray hereby re-incorporates and re-alleges paragraphs 1-51.

55. As alleged herein, on September 29, 2014, twice on October 1, 2014 and on October 6, 2014, Google AdSense representatives Ryan J, Roy and Jacky G reassured Super Cray's co-founders in writing that Super Cray's AdSense advertisements were correctly implemented and did not encourage accidental, invalid clicks.

56. On information and belief, Ryan J, Roy and Jacky G's statements were false and misleading at the time they were made. They were false and misleading not because Super

Cray's AdSense advertisements were actually improper, but because these Google AdSense employees knew or should have known that Google had planned to arbitrarily ban Super Cray for having an improper layout in order to avoid paying Super Cray its accrued earnings, thereby allowing Google to keep all the AdSense revenue for itself.

57. On information and belief, Ryan J, Roy and Jacky G knew or should have known their statements were false because as AdSense employees, they knew about Google's AdSense practices that had been in existence since sometime in 2009.

58. On information and belief, Ryan J, Roy and Jacky G were following Google's internal directives to reassure nascent but high-earning AdSense publishers that their website layouts were fine, even though Google planned to cite those same layouts as a reason for terminating their accounts in the future. Such reassurances would encourage those publishers to drive additional traffic to their AdSense advertisements which, in turn, would increase Google's AdSense revenue.

59. On information and belief, Google had little concern about defrauding a nascent publisher such as Super Cray because Super Cray, like other publishers such as PubShare, had no media attention and no dedicated following. It was unlikely there would be any significant outcry should Super Cray publicize the fact of Google's wrongdoing.

60. Super Cray justifiably relied upon Ryan J, Roy and Jacky G's assurances. After all, Google expressly directed AdSense publishers to pose such queries with its AdSense representatives and to take direction from those representatives on how to organize the layout of AdSense advertisements.

61. Super Cray was damaged by Google's deception because it did not receive any of the $535,000 it had accrued in AdSense earnings.

62. Even if Super Cray is somehow not entitled to its $535,000 in AdSense earnings for any reason, it was still damaged by justifiably relying on Google's deceptive statements because it incurred over $300,000 in costs in efforts to increase user traffic to SuperCrayCray.

63. Super Cray was also damaged because it lost future profits due to Google's deception. Had Super Cray been aware of the nature of Google's deceptive statement, it would

have halted its participation in the AdSense program and partnered up instead with other on-line advertising programs such as Adversal or Bidvertiser known to be honest and scrupulous with its publishers. The $300,000 in costs spent by Super Cray would have led to increased user traffic for those alternate programs and Super Cray would be earning substantial monthly advertising revenue today from those programs instead of being on the verge of bankruptcy.

## SECOND CAUSE OF ACTION
**(Negligent Misrepresentation – Cal. Civ. Code § 1710(2))**

64. Super Cray hereby re-incorporates and re-alleges paragraphs 1-61.

65. As alleged herein, on September 29, 2014, twice on October 1, 2014 and on October 6, 2014, Google AdSense representatives Ryan J, Roy and Jacky G reassured Super Cray's co-founders in writing that Super Cray's AdSense advertisements were correctly implemented and did not encourage accidental, invalid clicks.

66. Ryan J, Roy and Jacky G's statements were false and misleading at the time they were made. Pleading strictly in the alternative, Super Cray alleges that these statements were false and misleading because Super Cray's advertisements were later found by Google to have an improper layout that encourages accidental clicks and caused Google to ban Super Cray.

67. Ryan J, Roy and Jacky G knew or should have known their statements were false because their specific jobs as AdSense customer service representatives was to know whether AdSense layouts for a particular publisher were valid and to assist publishers in formatting proper layouts for AdSense.

68. Super Cray justifiably relied upon Ryan J, Roy and Jacky G's assurances. After all, Google expressly directed AdSense publishers to pose such queries with its AdSense representatives and to take direction from those representatives on how to organize the layout of AdSense advertisements.

69. Super Cray was damaged by Google's negligent misrepresentations because it did not receive any of the $535,000 it had accrued in AdSense earnings.

70. Even if Super Cray is somehow not entitled to its $535,000 in AdSense earnings for any reason, it was still damaged by justifiably relying on Google's negligent

misrepresentations because it incurred over $300,000 in costs in efforts to increase user traffic to SuperCrayCray.

71. Super Cray was also damaged because it lost future profits due to Google's negligent misrepresentation. Had Super Cray been aware of the nature of Google's negligent misrepresentations, it would have immediately corrected any problems that existed. Super Cray would have received its earnout, re-invested those earnings into driving even more user traffic to its website and would be earning substantial monthly advertising revenue today from those programs instead of being on the verge of bankruptcy.

**THIRD CAUSE OF ACTION**
**(Breach of Contract)**

72. Super Cray hereby re-incorporates and re-alleges paragraphs 1-69.

73. Super Cray entered into the AdSense Agreement with Google.

74. Super Cray fully performed all of its obligations under the AdSense Agreement, as confirmed by Google AdSense representatives Ryan J, Roy and Jacky G on September 29, 2014, twice on October 1, 2014 and on October 6, 2014.

75. In breach of the AdSense Agreement, Google: (a) failed to pay Super Cray for the number of valid clicks on advertisements displayed on SuperCrayCray, the number of valid impressions of advertisements displayed on SuperCrayCray, and/or other valid events performed in connection with the display of advertisements on SuperCrayCray using Google's AdSense program; and (b) terminated the AdSense Agreement with Super Cray without reason.

76. As a proximate result of Google's breach of contract, Super Cray has been damaged of no less than $535,000.

77. In addition, Google's breach of contract damaged Super Cray because it lost future profits as a result. Had Super Cray received its earnout as Google was contractually obligated to pay, it would have re-invested those earnings into driving even more user traffic to its website and would be earning substantial monthly advertising revenue today from those programs instead of being on the verge of bankruptcy.

78. Google was fully aware that its breach of contract could result in lost future profits for Super Cray. Google encourages its publishers to acquire additional user traffic by using advertising or partnering with traffic sites. Such efforts obviously come at a financial cost to the publisher and cannot be sustained if Google does not pay out the earnings derived from such investment of funds by the publisher.

**FOURTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

79. Super Cray hereby re-incorporates and re-alleges paragraphs 1-76.

80. Google has a duty under California law to act in good faith and deal fairly with Super Cray in connection with the parties' AdSense Agreement and its obligations in administering the AdSense advertising program.

81. Google breached its duty of good faith and fair dealing by arbitrarily and capriciously terminating Super Cray's account and withholding its AdSense earnings even after Google AdSense representatives Ryan J, Roy and Jacky G had confirmed to Super Cray on September 29, 2014, twice on October 1, 2014 and on October 6, 2014 that it was fully complying with AdSense policies.

82. Google breached its duty of good faith and fair dealing by refusing to provide a meaningful review of Super Cray's internal appeal to Google over its purported AdSense policy violation.

83. As a proximate result of Google's breach of duty, Super Cray has been damaged of no less than $535,000.

84. In addition, Google's breach of duty damaged Super Cray because it lost future profits as a result. Had Super Cray received its earnout as Google was contractually obligated to pay, it would have re-invested those earnings into driving even more user traffic to its website and would be earning substantial monthly advertising revenue today from those programs instead of being on the verge of bankruptcy.

85. Google was fully aware that its breach of duty could result in lost future profits for Super Cray. Google encourages its publishers to acquire additional user traffic by using

advertising or partnering with traffic sites. Such efforts obviously come at a financial cost to the publisher and cannot be sustained if Google does not pay out the earnings derived from such investment of funds by the publisher.

**FIFTH CAUSE OF ACTION**
**(Cal. Bus. & Prof. Code §§ 17200, et seq.)**

86. Super Cray hereby re-incorporates and re-alleges paragraphs 1-83.

87. Google's practices, as alleged herein, violate California Civil Code sections 1709 and 1710.

88. Google engaged in these unlawful practices to the detriment of Super Cray for the purpose of increasing its profits.

89. As a result of such unlawful actions, Super Cray has suffered and continues to suffer injury in fact and has lost money as a result of these practices.

90. Super Cray seeks full restitution of monies, according to proof, acquired by Google from Super Cray by means of the unlawful practices alleged herein.

91. Super Cray seeks an injunction to prohibit Google from continuing to engage in the unlawful practices alleged herein.

**PRAYER**

**WHEREFORE**, Plaintiff Super Cray Inc. prays for judgment as follows:

1. For judgment against defendant Google Inc.;
2. For compensatory damages;
3. For punitive damages;
4. For permanent injunctive relief;
6. For restitution;
7. For pre-judgment interest;
8. For costs; and
9. For such other and further relief as the Court deems just and proper.

Dated: January 8, 2015

GAW | POE LLP

By: ______________________

Mark Poe
Attorneys for Plaintiff Super Cray Inc.

**JURY DEMAND**

Plaintiff Super Cray Inc. hereby demands a jury trial for its claims against defendant Google Inc.

Dated: January 8, 2015

GAW | POE LLP

By: ______________________________

Mark Poe
Attorneys for Plaintiff Super Cray Inc.