Mark Poe (S.B. #223714) – mpoe@gawpoe.com
Randolph Gaw (S.B. #223718) – rgaw@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff Super Cray Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| SUPER CRAY INC. <br><br> Plaintiff, <br><br> v. <br><br> GOOGLE INC. <br><br> Defendant. | Case No. 5:15-cv-00109-LHK <br><br> **AMENDED COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff Super Cray Inc. ("Super Cray") hereby makes the following allegations:

1.      Super Cray is the publisher of a popular entertainment website called SuperCrayCray (www.supercraycray.com).  It entered into an agreement with defendant Google Inc. ("Google") to publish Google's AdSense advertisements on SuperCrayCray.

2.      Super Cray fully complied with the requirements of the AdSense program when displaying Google's advertisements.  Google provided to all AdSense publishers examples of improper advertising layouts for AdSense, and Super Cray scrupulously and continually reviewed these examples and abided by them.  And furthermore, on multiple occasions, Super Cray reached out to Google AdSense representatives by e-mail and Google's Internet chat program for confirmation that Super Cray's ad placements on SuperCrayCray were valid and conformed to all AdSense policies, including those policies designed to ensure that the layout of AdSense

AMENDED COMPLAINT
CASE NO. 5:15-CV-00109-LHK

advertisements did not encourage "accidental clicks." Super Cray received written confirmation on each of those occasions from Google that everything was done in accordance with AdSense's terms of service.

3.     Encouraged by Google's written confirmations, and also in reliance on the Google-provided examples regarding AdSense layouts, Super Cray invested significant sums of money – over $300,000 – to accelerate the monetization of SuperCrayCray. Specifically, Super Cray spent such money to have SuperCrayCray and its articles prominently placed and displayed on various popular Internet websites, such as Facebook. With such placement, user traffic to SuperCrayCray surged and many more users were exposed to Google's advertisements on that website.

4.     According to Super Cray's account records with Google AdSense, by October 21, 2014, Super Cray had accrued $535,000 in earnings under Google AdSense. But on that day, which was supposed to be the same day that Google was to pay out the accrued earnings, Google instead notified Super Cray that its AdSense account had been suspended because its advertising layout "encourages accidental clicks."

5.     Super Cray has attempted to appeal Google's decision but Google's representatives refused to have any in-depth, substantive discussions regarding the purported deficiencies of SuperCrayCray, and refused to acknowledge the prior representations by Google representatives that had led Super Cray to believe it was fully complying with AdSense's requirements.

6.     Reflecting the lack of good faith demonstrated by Google, in the course of its internal appeals process with Super Cray, Google cited a purported failure by Super Cray to adhere to a particular policy as one of the grounds for suspension of its AdSense account. That particular policy cited by Google, however, was different from the existing policy that was in place prior to October 21, 2014. In other words, Google cited Super Cray's failure to follow a policy not yet in existence as one of its bases for suspending Super Cray's account and refusing to pay out the $535,000 it had accrued in earnings.

1       7.     Google's overall response is not surprising, however, in light of growing reports that Google systemically suspends and withholds payment on high-earning AdSense accounts for arbitrary and capricious reasons, typically right before payouts on such earnings are due.

8.     Google has claimed that all funds withheld from its AdSense publishers were actually refunded back to Google's advertisers.  Of course, Google has resisted producing any documents or evidence that could substantiate that claim.  More importantly, even if Google does, in fact, refund its advertisers with the earnings confiscated from its AdSense publishers, such an action is done for the benefit of Google at the expense of its AdSense publishers.  Google is essentially providing discounted advertising rates to its advertisers at the expense of disfavored AdSense publishers.  This is done by Google to entice advertisers into using, or staying with, the AdSense platform, which is especially critical for Google given the noticeably large decline in AdSense-related revenue growth over the past several years.

**PARTIES**

9.     Plaintiff Super Cray Inc. is a New York corporation that has its principal place of business in New York.

10.     Defendant Google Inc. is a Delaware corporation that has its principal place of business in California.

**JURISDICTIONAL STATEMENT**

11.     The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are all citizens of different states and the amount in controversy exceeds $75,000.

12.     The Court has personal jurisdiction over Google because it transacts business in California and because in the Google AdSense Online Terms of Service, it expressly consents to personal jurisdiction in this Court.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Google resides and regularly conducts business in this district.

**INTRADISTRICT ASSIGNMENT**

14.     Google's headquarters is located in Mountain View, California, and therefore assignment to the San Jose division of this Court is appropriate.

# FACTUAL ALLEGATIONS

## *Background on AdSense*

15.     Google is the largest online marketing/advertising business in the world.  The AdWords Advertising Program ("AdWords") is Google's primary advertising program. AdWords advertisements are displayed in a variety of formats such as text and/or images, alongside or above search results, on webpages, in e-mails, on blogs, and/or in videos.

16.     The Google AdSense Content program enables online publishers of websites to partner with Google to earn revenue from AdWords advertisements displayed on websites under their ownership, license, registration and/or other control.  Google tracks each time Internet users click on advertisements displayed on AdSense publishers' websites and charges advertisers for each click.  Google pays the AdSense publishers a portion of the amount paid by advertisers for the clicks, while retaining the remaining portion for itself.

17.     According to Google, publishers participating in the AdSense Content program are promised a 68% revenue share.  (https://support.google.com/adsense/answer/180195?hl=en). Furthermore, Google touts the superiority of its on-line advertising program against programs offered by competitors, as it stated "Another ad network might offer an 80% revenue share, but only collect $50 from advertisers, so you'd receive $40.  With the vast number of advertisers competing to appear on AdSense sites, our system ensures that you're earning the most possible for every ad impression you receive."

18.     The Google AdSense Online Terms of Service ("AdSense Agreement") governs the relationship between website publishers and Google for the AdSense Content program. Google unilaterally drafts all contracts, policies, procedures, and guidelines governing the relationship between Google and AdSense publishers, as well as any and all amendments and modifications.

19.     The AdSense Agreement provides the following policies and procedures for payments to publishers:

**Section 5: Payments**

Subject to this Section 5 and Section 10 of these AdSense Terms, you will receive a payment related to the number of valid clicks on Ads displayed on your Properties, the number of valid impressions of Ads displayed on your Properties, or other valid events performed in connection with the display of Ads on your Properties, in each case as determined by Google.

…

Payments will be calculated solely based on our accounting. Payments to you may be withheld to reflect or adjusted to exclude any amounts refunded or credited to advertisers and any amounts arising from invalid activity, as determined by Google in its sole discretion. Invalid activity is determined by Google in all cases and includes, but is not limited to, (i) spam, invalid queries, invalid impressions or invalid clicks on Ads generated by any person, bot, automated program or similar device, including through any clicks or impressions originating from your IP addresses or computers under your control; (ii) clicks solicited or impressions generated by payment of money, false representation, or requests for end users to click on Ads or take other actions; (iii) Ads served to end users whose browsers have JavaScript disabled; and (iv) clicks or impressions co-mingled with a significant amount of the activity described in (i, ii, and iii) above…

20.      Further, the AdSense Agreement contains the following policies and procedures for termination or suspension of AdSense publisher accounts:

**Section 10: Termination**

You may terminate the Agreement at any time by completing the account cancellation process. The Agreement will be considered terminated within 10 business days of Google's receipt of your notice. If you terminate the Agreement and your earned balance equals or exceeds the applicable threshold, we will pay you your earned balance within approximately 90 days after the end of the calendar month in which the Agreement is terminated. Any earned balance below the applicable threshold will remain unpaid.

Google may at any time terminate the Agreement, or suspend or terminate the participation of any Property in the Services for any reason. If we terminate the Agreement due to your breach or due to invalid activity, we may withhold unpaid amounts or charge back your account…

21.      Under California law, Google is contractually obligated to act in good faith and deal fairly with AdSense publishers in implementing its stated policies and guidelines in the AdSense Agreement.

22.      In particular, Google is obligated, pursuant to the terms of Section 5 of the AdSense Agreement, to act in good faith and deal fairly with AdSense publishers in: (a) determining the validity of clicks, impressions, and other activities/events performed in connection with the display of advertisements on the publisher's websites; (b) accounting for the

payments owed to publishers under the AdSense Agreement; (c) and withholding payments arising from activity Google deems invalid.

23.    Additionally, Google is obligated, pursuant to the terms of Section 10, to act in good faith and deal fairly with AdSense publishers in: (a) suspending or terminating the AdSense Agreement; (b) suspending or terminating the participation of any website in the AdSense program; (c) determining that an AdSense publisher breached the AdSense Agreement; (4) determining that an AdSense publisher engaged in invalid activity; and (5) withholding or charging back payments earned by an AdSense publisher under the AdSense Agreement.

### *Background on Super Cray*

24.    Super Cray completed an application to participate as a publisher in the Google AdSense program for its SuperCrayCray website.

25.    SuperCrayCray is a humorous website with the tagline "Where Ridiculous Meets Entertainment." Its founders spend time assembling photographs in the public domain of celebrities and other famous people and then crafting "lists" and writing original content to provide information about the featured personages designed to amuse the viewer or provoke thoughtful discussion.

26.    One example is a post on SuperCrayCray titled "7 Startups You Didn't Know Were Funded By A-List Celebrities," which can be found at http://supercraycray.com/7-startups-you-didnt-know-were-funded-by-a-list-celebrities/. The post – broken up over several pages in a style similar to other websites such as Buzzfeed or Cracked – features on each page a photograph of a popular celebrity, such as Justin Bieber, Jared Leto, Lady Gaga and Ashton Kutcher. Accompanying each photograph is an explanation of the startup company that counts that celebrity as an early investor – viewers are informed that Justin Lieber is an investor in a photograph-based startup called Shots, Jared Leto is an investor in the recently-acquired-by-Google-for-$3.2 billion startup called Nest, Lady Gaga is an investor in a social network called Backplane and Ashton Kutcher is an investor in Airbnb.

27.    Google granted Super Cray's application to participate in the AdSense program and provided it with hypertext mark-up language ("HTML") to insert in SuperCrayCray's source

code to display the AdSense advertisements.  SuperCray inserted the supplied HTML into SuperCrayCray's source code and the website began displaying targeted advertisements to its viewers through the AdSense program in early September 2014.

28.     Substantial time and resources were spent in developing SuperCrayCray and its content for purposes of monetizing the website through advertising.

### Google Affirms SuperCrayCray's Compliance with AdSense Requirements and Policies

29.     SuperCrayCray, and its formatting of Google's AdSense advertisements, complied with all of Google's Ad Placement Policies, which are available to publishers at https://support.google.com/adsense/answer/1346295?hl=en.  Google Ad Placement Policies also provide examples of improper advertising layouts for AdSense publishers, and on multiple occasions throughout September and October 2014, Super Cray reviewed these Google-supplied examples and scrupulously followed them in designing its AdSense advertising layouts.

30.     In particular, SuperCrayCray did not encourage accidental clicks.  SuperCrayCray did not display ads in such a way that they might have been mistaken for other website content. SuperCrayCray did not place ads under misleading headers or titles.  SuperCrayCray did not use language to encourage users to click on ads.  SuperCrayCray did not bring unnecessary or unnatural attention to its ads.  SuperCrayCray did not place ads on pages or sites where dynamic content was the primary focus.  SuperCrayCray did not place links, play buttons, download buttons, games, drop-down boxes, or applications near ads.  SuperCrayCray did not place ads on noncontent-based pages.  SuperCrayCray did not offer users compensation for clicking ads. SuperCrayCray did not disguise ads on its webpages.  SuperCrayCray did not attempt to associate specific images with individual ads appearing on their sites.  SuperCrayCray did not display its content below the fold.  SuperCrayCray did not display ads in software applications. SuperCrayCray did not display ads in e-mail messages.  SuperCrayCray displayed ads only from Google's AdSense network.  SuperCrayCray did not display ads from any other publishers. SuperCrayCray did not display more than the maximum of three standard ad units, three link units, and two search boxes on one webpage.  SuperCrayCray did not display ads on password-

protected pages. SuperCrayCray websites did not have more than three pop-ups. SuperCrayCray did not display ads in pop-up windows.

31. Furthermore, Google expressly affirmed to Super Cray on multiple occasions that the advertisements it was displaying on its website fully conformed with Google's AdSense policies.

32. Google AdSense allows a publisher to "self-report" its website to Google so that Google could verify that the website was fully compliant with AdSense policies. Publishers might do this because, for example, they see a spike in their click-thru-rate ("CTR") (i.e., the percentage of website viewers that click on advertisements) and want Google to verify that the increased CTR was not due to "click fraud," improper advertisement, website formatting or other factors that could cause Google to find an AdSense advertisement to be invalid.

33. Google encourages publishers to self-report so that those publishers can make any necessary corrections to their website far in advance of the payout date. This benefits Google as well, because advertisers are not likely to pay Google for advertisements that featured an unusually high CTR.

34. On September 29, 2014, Super Cray co-founder Denis Ganev participated in an Internet chat carried out on Google's proprietary chat program with a Google AdSense representative named "Ryan J" after Super Cray had performed a self-report on itself to Google. In that conversation, the parties stated:

> **Denis**: We reported our selves previously in the month asking to verify if our site is fully complaint (sic) with all TOS [Terms of Service]. We never received a response, does that normally mean that it was checked and no issues were found?
>
> **Ryan J**: Correct, warnings are resolved once you mark them as such. If there is a future issue the policy team will get back to you.
>
> **Denis**: Honestly, our biggest concern was our CTR on our ads. We wanted to confirm if it was inline with whats normal. We wanted to double check that the CTR was not in anyway a result of accidental clicks, or what not. Is that something that's checked periodically when a site scales quickly? Or is that something checked in the 2 week period?
>
> **Ryan J**: We do validate all clicks and impressions and are monitoring it constantly. **The CTR you are seeing is within the normal range. I'm also not seeing any concerns are you site, ex. implementation that could cause a high amount of accidental clicks.**

35.     By the end of September 2014, SuperCrayCray had accrued $197,045.69 in AdSense earnings according to Google.  That number had been slightly reduced compared to previous figures estimated by Google, so on October 1, 2014, Super Cray co-founder Ryan Kalscheuer contacted Google with questions.  In another Internet chat with "Ryan J," Ryan J explained that the estimated earnings had been reduced compared to the final earnings because of CTR that Google determined to be invalid.  In addition:

> **Ryan K**: Is there any other reason for further adjustments for the month of Sept?  Can I count on receiving this amount, $197,045.69 later in the month?
>
> **Ryan J**: Yes, those earnings have finalized and **will be paid out** on the 21st of the month. Then you will receive it a few days later.

36.     Also on October 1, 2014, another Google AdSense representative called "Roy" responded by e-mail to a separate query by Super Cray co-founder Kirill Fuchs.  In Kirill's e-mail, he had asked:

> Hello,
>
> My question is regarding an ad placement we currently have. Our 336x280 (desktop) and 300x250 (mobile) both have a significant click through rate on the first page of some of our articles. I wanted to verify that our ad placement is not generating invalid activity such as accidental clicks. Is there anyway to tell if our conversion rate for those ads are below normal ranges? Thank you in advance, I understand it's difficult to accommodate every publishers request to verify such things.
>
> An example page would be:
> http://supercraycray.com/15celebritiesthatreallyhateeachother/

37.     Roy responded:

> Hi Kirill,
>
> Happy to help. I reviewed your account and website supercraycray.com , and found correct implementations for both 336x280 (desktop), and 300x250 (mobile). We definitely appreciate your honesty and your efforts to keep your account in good standing.
>
> For your reference, you can find tips and guidelines for keeping your account in good standing by visiting https://www.google.com/support/adsense/bin/answer.py?answer=23921. Hope this is useful. Feel free to write me for any further clarifications.
>
> Thanks,
>
> Roy
> The Google AdSense Team

38.     On October 6, 2014, Kirill contacted Google with questions regarding SuperCray's declining cost-per-click ("CPC") that it was earning from its AdSense advertisers.  In an Internet chat with Google AdSense representative "Jacky G," the parties stated:

**Kirill**: We tend to see higher CTR at the bottom of the page.  But for some reason the CPC is higher for the first unit of th page.  We originally ran the 300x250 at the top but switched positions about a week ago since that one has higher CPC.

**Jacky G**: The ad unit at the top of a page will generally perform better because it's above the fold and users will always see the ad.  Ads further down a page are not guaranteed the same visibility.  **It's great that you've labeled your ads because this will reduce invalid clicks.**  It's also possible that the 300x100 performed better because it doesn't take up as much space.  Placing the 300x250 right below the article title would have pushed your content below the fold and likely caused more accidental clicks.

**I'd stick with your current implementation.**

My only suggestion would be to increase the size of your navigation buttons just so they're obvious to your users.

**Actually I just navigated past the first page and the previous and next buttons are bright and obvious.**

**My suggestion would be to keep this implementation** and monitor it's performance over the next few weeks.  CPCs should adjust for the change soon and you'll likely start seeing a boost because of the holidays.

39.     Due to its reliance on the Google-provided guidelines regarding proper advertising layouts, and by Google's written confirmations to it on September 29, October 1 and October 6, Super Cray spent over $300,000 having SuperCrayCray and its articles prominently advertised, placed and displayed on websites like Facebook.  The idea was to increase user traffic to SuperCrayCray and thus present more viewers to its AdSense advertisements.  Assuming that SuperCrayCray's advertisements maintained its 2-3% CTR (the standard for valid Google CTRs being 2-4%), Super Cray would make more money off the increased advertisement revenue than it was spending on acquiring user traffic.

40.     In fact, Google encourages publishers to increase their user traffic using such means.  As part of its suggested tips regarding site optimization on its Ad Traffic Quality Resource Center, Google states that "[a]cquiring new traffic to your website is another common way to generate increased traffic.  Common ways to do this include search engine optimization, **advertising** and **partnering with traffic providers**."

41.     Increasing traffic to an AdSense publisher's website, after all, would also result in added revenue to Google itself.

### Google Damages Super Cray

42.     By October 21, 2014, Super Cray's accrued earnings from the AdSense program were $535,000 according to Google.  October 21 was also the day Google was supposed to pay out its AdSense revenues to its publishers, as confirmed by Ryan J on October 1.

43.     Instead of receiving a payout from Google, however, on October 21, 2014, Super Cray received a notification from Google that its account had been suspended for "Layout Encourages Accidental Clicks."  Google refused to pay anything to Super Cray.

44.     Super Cray has repeatedly tried to discuss the issue with Google AdSense representatives and point out that Google expressly validated SuperCrayCray's layout on September 29, twice on October 1 and also on October 6.

45.     Google, however, refused to carry on any in-depth substantive discussions with Super Cray and has refused to pay anything despite Super Cray having caused Google to earn over $786,000 in advertising revenue from AdSense.  The lack of meaningful communication persisted even though Google reinstated Super Cray's AdSense account on or around November 4, 2014 – despite Super Cray having not changed the layout for SuperCrayCray in any way prior to such reinstatement – as an implicit acknowledgment that Google had wrongfully suspended Super Cray in the first place and that Super Cray had not violated any AdSense policies.

46.     For example, on November 4, 2014, Kirill had the following conversation on Google's proprietary chat program with a Google account representative named "Stephanie D," where "Stephanie D" steadfastly refused to allow Super Cray to even talk to a Google representative that could explain what, exactly, Super Cray did wrong in light of Google's prior representations to it:

> **Kirill**: Our adsense account was disabled Oct 21st. It was reinstated today. I'm trying to understand what I see in the payments screen.
>
> I'd like to know, what amount are we being paid, and when is it being issued?
>
> **Stephanie D**: I'm checking our records now, one moment please.

1    Still checking, thanks for your patience

2    Hmm, it looks like all of your earnings prior to your account termination were revoked

3    **Kirill**: Is there someone we can speak to in person or over the phone. We are located in
4    New York, the chealsea office is only a train ride away.

5    **Stephanie D**: However, it does looks like the earnings are the process of being reinstated

6    **Kirill**: Ok so I'm confused... Can you please clarify?

7    **Stephanie D**: It looks like all of your earnings were debited from your account when it
     was terminated

8    But I see a note that the review team has submitted a request to reinstate the earnings after
9    your account was reinstated

10   **Stephanie D**: Actually, sorry I have just given you incorrect information

11   The earnings will not be reinstated

12   **Kirill**: Ok, is there someone we can speak to in person, or over the phone?

13   **Stephanie D**: I'm unable to offer phone support for you

14   **Kirill**: Who can we contact regarding the issue?

     To us the amount in the account is not small.
15
     **Stephanie D**: Yes, it's definitely a lot of money, which is why I double checked that I read
16   the notes correctly

17   I don't see any account manager assigned to your account, which is usually who could
18   speak to about this situation

19   **Kirill**: Considering the circumstances, would you be able to bump this up to an account
     manager?

20   **Stephanie D**: I am not an escalation path for account management

21   Based on what I can see in your account, your earnings were completely removed

22   And there is a request to update your payment history with a zero balance to reflect that

23   **Kirill**: Who can speak to, or who can I contact that would be able to escalate this?

24   **Stephanie D**: From what I can see right now, no one

25   **Kirill**: Stephanie, you have to understand we've had a very rough couple of weeks as a
     result of the news we heard on Oct 21st. I'm not sure what you see on your end regarding
26   our case but I feel the circumstances warrant us being able to speak with someone.

27   **Stephanie D**: Sorry, I have no phone number to offer you

28

47. Kirill managed to have a chat later that same day with "Jacky G" who acknowledged the unfairness of the situation facing Super Cray, especially since Google withheld Super Cray's accrued AdSense earnings for September 2014 – $197,045.69 – despite those earnings having already been "finalized" by Google (i.e., validated as authentic):

**Kirill**: If our September earnings were finalized then how come they are not being paid?

**Jacky G**: Your September earnings are paid in October and your account was disabled in October therefore the earnings were not paid out.

Any unpaid earnings in an account at the time it is disabled, are returned to advertisers.

**Kirill**: If our Sept earnings were finalized and only 56k was taken out. Why would the Sept earnings all of a sudden not be valid after they were already checked?

You have to understand this from our shoes. We were told everything is good, so we went ahead and invested further into our company. It was not a small amount at the least bit.

We then couldn't even find out any info or reach anyone for the past 2 weeks... It's not exactly an easy pill to just swallow.

**Jacky G**: Our policy is that any unpaid earnings in the account are returned to advertisers at the time an account is disabled.

Your September earnings were unpaid therefore they were removed from your account.

**Kirill**: We don't have the type of bank account google does, nor the type of resources, and we placed our trust in receiving what we were told to receive.

**Jacky G**: I completely understand your frustration and I'm sorry I can't assist further.

48. And when Kirill challenged "Jacky G" about Google's finding that Super Cray supposedly had a layout that encouraged accidental clicks, she did not deny that Google representatives had previously told Super Cray the exact opposite:

**Kirill**: "The CTR you are seeing is within the normal range. I'm also not seeing any concerns are you site, ex. implementation that could cause a high amount of accidental clicks."

I reviewed your account and website supercraycray.com , and found correct implementations for both 336x280 (desktop), and 300x250 (mobile). We definitely appreciate your honesty and your efforts to keep your account in good standing.

**Jacky G**: I'm aware these are snippets from past conversations with our support team members.

49. Then on November 6, 2014, "Jacky G" followed up in an e-mail to Kirill stating that Google recommended that, in the future, Super Cray "review the "Avoiding accidental

clicks" section of our ad placement policies to ensure that Super Cray was complying with the policies intended to prevent "generating invalid activity."

50.     Incredulous, Kirill responded in an e-mail on November 7, 2014 by pointing out that the "Avoiding accidental clicks" website link that "Jacky G" had sent him "was changed on the day of Oct 21st [2014].  Prior, the examples on that page were significantly different."

51.     "Jacky G" then replied on November 12, 2014 by acknowledging that Google's ad placement policies had, in fact, been changed but claimed (without showing any proof) that the change took place on October 10, not October 21.  She did not deny that Super Cray had been fully compliant under Google's prior ad placement policies.

52.     Super Cray had frequently reviewed Google's ad placement policies to ensure it was in compliance thereof, so it appears "Jacky G" was lying, or at least misinformed, about claiming that Google's ad placement policies were changed on October 21, 2014 (the date of Super Cray's account suspension) instead of October 10, 2014.

53.     Even assuming "Jacky G" was telling the truth that Google's ad placement policies were changed on October 10, 2014, no one at Google ever informed Super Cray that its ad placement policies had changed prior to Super Cray's account suspension.  No one provided such information even though Super Cray had requested, and received, verification that Super Cray was fully compliant with Google's prior ad placement policies as late as October 6, 2014.

***Super Cray's AdSense Layout Was Similar to Other Major AdSense Publishers***

54.     Adding to Super Cray's frustration over the arbitrary and unfair nature of Google's suspension was that its co-founders could see with their own eyes that Super Cray's purportedly invalid AdSense advertisement layouts were almost identical to the advertisement layouts used by other major AdSense publishers, who were not having their accounts suspended by Google.

//

//

//

1    55.    For example, the following is a recent screenshot taken from AdSense publisher

2    Answers.com (www.answers.com).  Answers.com had been using the same style of AdSense

3    advertising layouts all throughout the year 2014.  On information and belief, Google has not

4    informed Answers.com that this advertising layout violated any AdSense advertisement

5    placement policies.

56.     And the following is a screenshot from SuperCrayCray featuring its AdSense advertising layout during the period of time prior to its account suspension on October 21, 2014.



57.     As seen in the two screenshots, SuperCrayCray's AdSense advertisement layouts were nearly identical to Answers.com.  Both websites had advertisements below the heading of the article, and then below the photograph accompanying the article.  Both also placed advertisements on the right hand side of the page (with Answers.com putting an additional advertisement on the left hand side of the page).  And neither site displayed the advertisements in a way that suggested the advertisements were part of the article itself.

//

//

//

58. And the following is a screenshot from AdSense publisher PressRoomVIP (www.pressroomvip.com). PressRoomVIP had been using the same style of AdSense advertising layouts all throughout the year 2014. On information and belief, Google has not informed PressRoomVIP that this advertising layout violated any AdSense advertisement placement policies. And as a simple visual inspection shows, PressRoomVIP's AdSense advertisement layouts were nearly identical to Answers.com and SuperCrayCray.



59.     And the following is a screenshot from AdSense publisher Urban Tabloid (www.urbantabloid.com).  Urban Tabloid had been using the same style of AdSense advertising layouts all throughout the year 2014.  On information and belief, Google has not informed Urban Tabloid that this advertising layout violated any AdSense advertisement placement policies.  And as a simple visual inspection shows, Urban Tabloid's AdSense advertisement layouts were nearly identical to Answers.com, SuperCrayCray, and PressRoomVIP.



### *Google's Motivations for Defrauding Super Cray*

60.     It is no secret that Google's rate of revenue growth for AdSense has declined dramatically over the years.

61.     For example, according to Google's Form 10-K for its 2011 fiscal year, it received AdSense-related revenue of $7.16B in 2009, $8.792B in 2010 and $10.38B in 2011.  That reflected an average of 20% growth in AdSense revenue from 2010 to 2009, and from 2011 to 2010.

62.     According to Google's Form 10-K for its 2014 fiscal year, it received AdSense related revenue of $12.465B in 2012, $13.125B in 2013 and $13.971B in 2014.  That reflected 20% growth in AdSense revenue from 2012 to 2011.  But for 2013, there was only 5% growth over 2012.  And for 2014, there was only 6.4% growth over 2013.

63.     Financial analysts have taken note of this decline.  For example, in an October 21, 2013 article on ZDnet, one analyst wrote that "Google's latest quarterly financial report shows problems in its AdSense network" and that AdSense revenue growth was now badly lagging behind AdWords revenue growth, which was a historical anomaly.

64.     In another example, in a July 17, 2014 article published by the New York Times, that article noted that Google's "cost per click" (i.e., the cost that advertisers pay Google each time someone clicks on an advertisement placed by Google) had now been declining for two years.  The article also noted the challenges faced by Google in the growing mobile advertising market (i.e., advertising for webpages viewed on smartphones and tablets) especially from Google's competitor Facebook.

65.     Assuming for the sake of argument that Google is, in fact, refunding 100% of earnings accrued by banned AdSense accounts back to publishers, this is only to Google's benefit.  When Google confiscates the funds from the publisher, and credits them back to the advertiser, it effectively (and substantially) lowers that advertiser's cost of advertising, **at the publisher's, not Google's** expense.  That is, the advertiser still received the click from the person who was browsing the publisher's site, but did not have to pay for it.  Through this process, Google earns substantial goodwill from its advertiser customer base, and obtains a competitive advantage vis-à-vis its competitors in the online advertising business who do not confiscate their publishers' accrued earnings and kick them back to the advertiser.

66.     In other words, it is as if Google had provided a "buy one click, get one click free" promotion to its advertisers except that AdSense publishers like Super Cray are the ones subsidizing the "free click" for those publishers.

67.     As seen by its declining AdSense revenue growth, its declining AdSense advertising rate and the increasing success of its mobile advertising competitors like Facebook, Google has no choice but to offer as many incentives as possible to entice advertisers to continue using the AdSense platform.

68.     Other examples of Google's conduct showing their efforts to provide discounted advertising for advertisers at the expense of AdSense publishers abound.  For example, a former AdSense publisher called PubShare (www.pubshare.com) had accrued nearly $1 million in AdSense earnings over September and October 2013 when Google abruptly terminated PubShare's account on November 5, 2013 and refused to pay out any amount of that $1 million.

69.     Similar to Super Cray, Google provided the following explanation to PubShare for its account termination: "Layout Encourages Accidental Clicks."  PubShare, however, displayed its Google AdSense advertisements in a format approved by Google.  And similar to Super Cray, Google has refused to have any in-depth, substantive discussions with PubShare regarding its decision to terminate that account.

70.     Also, a December 18, 2014 article published by Business Insider shared the plight of various other AdSense publishers who had complied with all applicable AdSense policies, yet recently found themselves banned and their payments withheld by Google for arbitrary and non-existent reasons similar to those offered against Super Cray.

71.     These publishers included a business accelerator site that lost $200,000, a publisher who lost $300,000, a text-messaging site (called MesTextos.com) that lost $46,000, a quiz site (QuizDee) that lost $35,000 and an Indian storytelling site (Evrystry.com) that lost $35,000.  All of those publishers were complying with AdSense policies at the time they were banned.

72.     The Business Insider article explained that Google's staff who communicates with AdSense publishers is not actually in charge of decisions on whether AdSense publishers are banned.  Instead, a different staff team within Google handles those decisions.

73.     That particular fact was also confirmed by "Jacky G" in her November 4, 2014 chat with Kirill.  She wrote: "The specialist team sits apart from the support team" and that it was the specialist team that claimed Super Cray was generating "an egregious amount of invalid clicks" and that she (i.e., the support team) had no further information about that issue.

74.     As a result, as experienced by Super Cray and as detailed by Business Insider, Google representatives would assure AdSense publishers that they were fully compliant with AdSense policies **even though they knew they were not making the judgment call as to whether the publishers were, in fact, complying with those policies**.

75.     In one example provided by Business Insider, an AdSense publisher was banned after receiving pre-clearance from Google, much like Super Cray.  This was a purported exchange between that publisher and a Google representative called "Laura S" before the publisher was banned from AdSense:

**Laura S**: Good.  Keep using the responsive ad sizes.

Is there anything else I might be able to help you with today?

**Publisher**: Just to confirm the account is back in good standing correct?

**Laura S**: You received a warning and from what I can see it looks you've corrected the two main issues of navigation and deceptive ad implementation by adding labels and the additional navigation and the top and in the side bar.

There is no additional action needed on your part at this time.

**Publisher**: Great thank you for your feedback.

**Laura S**: Happy to help!

76.     In another example provided by Business Insider, an AdSense publisher received a notification that its account was disabled without any prior warning.  The reason offered by Google was that the publisher was non-compliant with the AdSense program policies.  Yet in the prior month, that publisher had been contacted by a Google representative and was told that the

website was doing well.  The Google representative even offered further optimization for that publisher's website.

77.     Google declined to comment on or refute the Business Insider story.

78.     In speaking with a journalist about its story, that journalist volunteered to Super Cray that "I've had **a lot of feedback** from people like yourself who have lost money like this." Indeed, new lawsuits by wronged AdSense publishers are being filed all the time and more will undoubtedly be filed in the future until Google ceases its wrongful conduct.

<b>FIRST CAUSE OF ACTION</b><br/><b>(Fraud – Cal. Civ. Code §§ 1709, et seq.)</b>

79.     Super Cray hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

80.     As alleged herein, Google's AdSense Ad Placement Policies included examples of advertising layouts that Google considered to be invalid.  Such examples would feature sample websites with advertising inserts and explanations as to why those inserts were unacceptable in some way under the AdSense program.  Super Cray repeatedly referenced these Google-provided examples all throughout September and October 2014 in order to ensure that SuperCrayCray was fully compliant with all applicable AdSense requirements.

81.     Also as alleged herein, on September 29, 2014, twice on October 1, 2014 and on October 6, 2014, Google AdSense representatives Ryan J, Roy and Jacky G reassured Super Cray's co-founders in writing that Super Cray's AdSense advertisements were correctly implemented and did not encourage accidental, invalid clicks.

82.     Ryan J, Roy and Jacky G's statements were apparently false, if Google is to be believed, as Google proceeded to suspend Super Cray's AdSense account on October 21, 2014 for having failed to comply with its AdSense policies and withheld all of Super Cray's accrued AdSense earnings.  Similarly, Google's advertising examples provided by it to Super Cray were apparently false, if Google is to be believed, given Google's subsequent actions towards Super Cray.

83.     Ryan J, Roy and Jacky G's statements were made with reckless disregard for their truth.  They all knew fully well that a different AdSense team was responsible for determining whether AdSense publishers were complying with AdSense policies and that this different team had sole discretion in approving, disapproving, suspending and banning AdSense publisher accounts.  Ryan J, Roy and Jacky G did not seek approval from the members of this other AdSense team before making their representations to Super Cray.  Instead, Ryan J, Roy and Jacky G assured Super Cray that it was fully complying with AdSense's terms and policies even though their personal judgment on that issue was completely irrelevant.

84.     It is Google's policy that the representatives that interact with and provide guidance to AdSense publishers are separate from the Google employees that actually determine an AdSense publisher is complying with the appropriate policies.  Nominally, Google claims this is because they do not want AdSense publishers to learn too much about Google's methods for detecting "click fraud."  In reality, this is because Google is utterly indifferent to whether most publishers are arbitrarily banned and their accrued AdSense earnings withheld, and so Google does not care if AdSense publishers are being provided erroneous information regarding their compliance with AdSense policies.

85.     There will always be a growing supply of AdSense publishers (i.e., those that try to make money from AdSense).  On the other hand, as evidenced from Google's own public filings and numerous media reports, there is a competitive market for advertisers (i.e., those that pay money to AdSense).  Thus, Google arbitrarily banning AdSense publishers and refunding their accrued earnings back to publishers serves to provide attractive, discounted rates to those publishers to entice them to continue using AdSense instead of other on-line and mobile advertising platforms like Facebook.  And as evidenced by Google's declining "cost per click" rate, Google has already had to decrease its advertising rates in order to hold on to what market share it currently has.

86.     As evidenced by the examples presented by Business Insider, Super Cray is not the only victim of Google's indifference as to whether its representatives are providing accurate feedback to AdSense publishers.

87.     Similarly, on information and belief, the authors of the Google-provided examples regarding AdSense advertising layouts were also not the same individuals that had actual authority and discretion to determine whether an AdSense publisher was complying with all AdSense policies.  Thus, Google published these examples for their AdSense publishers with reckless disregard as to whether such examples were accurate and truthful.

88.     Super Cray justifiably relied upon Ryan J, Roy and Jacky G's assurances, as well as the Google-provided examples.  After all, Google expressly directed AdSense publishers to pose such queries with its AdSense representatives and to take direction from those representatives on how to organize the layout of AdSense advertisements.  Google also specifically directed AdSense publishers to review the Google-provided examples for assistance in formatting AdSense-compliant websites.  Thus, Google also intended that Super Cray rely on the representations made by Ryan J, Roy and Jacky G, and rely upon the Google-provided examples.

89.     Super Cray was damaged by Google's deception because it did not receive any of the $535,000 it had accrued in AdSense earnings.

90.     Even if Super Cray is somehow not entitled to its $535,000 in AdSense earnings for any reason, it was still damaged by justifiably relying on Google's deceptive statements because it incurred over $300,000 in costs in efforts to direct user traffic to SuperCrayCray.

91.     Super Cray was also damaged because it lost future profits due to Google's deception.  Had Super Cray been aware of the nature of Google's deceptive statements, it would have halted its participation in the AdSense program and partnered up instead with other on-line advertising programs such as Adversal or Bidvertiser known to be honest and scrupulous with its publishers.  The $300,000 in costs spent by Super Cray would have led to increased user traffic for those alternate programs and Super Cray would be earning substantial monthly advertising revenue today from those programs instead of being on the verge of bankruptcy.

92.     Pleading in the alternative, Ryan J, Roy and Jacky G's statements to Super Cray on September 29, 2014, twice on October 1, 2014 and on October 6, 2014 were true because Super Cray was, in fact, fully complying with all AdSense policies.  Yet these statements were

nonetheless materially misleading when made because neither Ryan J, Roy nor Jacky G disclosed to Super Cray that they, in fact, had no discretion or authority whatsoever to determine whether an AdSense publisher was actually complying with all AdSense policies and that different Google employees could and would disregard Ryan J, Roy and Jacky G's opinions on this issue.

93.    Similarly, in the alternative, the Google-provided examples were also truthful and accurate.    Yet these statements were nonetheless materially misleading when made Google did not disclose to publishers that the authors of these examples had no discretion or authority whatsoever to determine whether an AdSense publisher was actually complying with all AdSense policies and that different Google employees could and would disregard whether or not an AdSense publisher complied with the Google-provided examples.

94.    At that time, Super Cray had no knowledge that Ryan J, Roy and Jacky G's opinions as to whether Super Cray was complying with relevant AdSense policies was utterly meaningless.  Similarly, Super Cray had no knowledge that the Google-provided examples were also completely useless.

95.    It was Google's policy to have Ryan J, Roy and Jacky G, or any of its other customer support representatives, omit any mention that they had no discretion or authority whatsoever to determine whether an AdSense publisher was actually complying with all AdSense policies (until that publisher was banned, at which point the customer support representative could reveal the truth as a means of shutting down dialogue between the publisher and Google).

96.    It was also Google's policy not to disclose that the Google-provided examples were not probative in any way towards its determination as to whether an AdSense publisher was fully complying with all applicable policies.

97.    As evidenced by the examples presented by Business Insider, Super Cray is not the only victim of Google's policy of having its representatives omit such key information in their discussions with AdSense publishers.

98.    Had Super Cray known that Ryan J, Roy and Jacky G's pronouncements were worthless, it would not have invested money into acquiring traffic for SuperCrayCray and, thus, would have avoided the harm that has already been alleged herein.  Furthermore, Super Cray's

reliance upon Ryan J, Roy and Jacky G's pronouncements was justifiable for the reasons already alleged herein.

99.     Had Super Cray known that the Google-provided examples were meaningless, it would not have invested money into acquiring traffic for SuperCrayCray and, thus, would have avoided the harm that has already been alleged herein.  Furthermore, Super Cray's reliance upon the Google-provided examples was justifiable for the reasons already alleged herein.

100.     Super Cray was damaged by Google's concealment of material facts for the reasons already alleged herein.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation – Cal. Civ. Code § 1710(2))

101.     Super Cray hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

102.     As alleged herein, Google's AdSense Ad Placement Policies included examples of advertising layouts that Google considered to be invalid.  Such examples would feature sample websites with advertising inserts and explanations as to why those inserts were unacceptable in some way under the AdSense program.  Super Cray repeatedly referenced these Google-provided examples all throughout September and October 2014 in order to ensure that SuperCrayCray was fully compliant with all applicable AdSense requirements.

103.     Google's advertising examples provided by it to Super Cray were apparently false, if Google is to be believed, given Google's subsequent actions towards Super Cray.

104.     On information and belief, the authors of the Google-provided examples regarding AdSense advertising layouts were also not the same individuals that had actual authority and discretion to determine whether an AdSense publisher was complying with all AdSense policies. Thus, Google published these examples for their AdSense publishers despite having no reasonable grounds for believing as to whether such examples were accurate and truthful.

105.     Similarly, as alleged herein, on September 29, 2014, twice on October 1, 2014 and on October 6, 2014, Google AdSense representatives Ryan J, Roy and Jacky G reassured Super

Cray's co-founders in writing that Super Cray's AdSense advertisements were correctly implemented and did not encourage accidental, invalid clicks.

106. Ryan J, Roy and Jacky G's statements were false and misleading because, if Google is to be believed, Super Cray's advertisements supposedly had an improper layout that encourages accidental clicks and caused Google to ban Super Cray.

107. Ryan J, Roy and Jacky G may have believed their statements were true, but they had no reasonable grounds for believing it at the time those statements were made. This is because they all knew fully well that a different AdSense team was responsible for determining whether AdSense publishers were complying with AdSense policies and that this different team had sole discretion in approving, disapproving, suspending and banning AdSense publisher accounts. Ryan J, Roy and Jacky G did not seek approval from the members of this other AdSense team before making their representations to Super Cray. Instead, Ryan J, Roy and Jacky G assured Super Cray that it was fully complying with AdSense's terms and policies even though their personal judgment on that issue was completely irrelevant.

108. Super Cray justifiably relied upon Ryan J, Roy and Jacky G's assurances, as well as the Google-provided examples. After all, Google expressly directed AdSense publishers to pose such queries with its AdSense representatives and to take direction from those representatives on how to organize the layout of AdSense advertisements. Google also specifically directed AdSense publishers to review the Google-provided examples for assistance in formatting AdSense-compliant websites. Thus, Google also intended that Super Cray rely on the representations made by Ryan J, Roy and Jacky G, and rely upon the Google-provided examples.

109. Super Cray was damaged by Google's negligent misrepresentations because it did not receive any of the $535,000 it had accrued in AdSense earnings.

110. Even if Super Cray is somehow not entitled to its $535,000 in AdSense earnings for any reason, it was still damaged by justifiably relying on Google's negligent misrepresentations because it incurred over $300,000 in costs in efforts to increase user traffic to SuperCrayCray.

111.     Super Cray was also damaged because it lost future profits due to Google's negligent misrepresentation.  Had Super Cray been aware of the nature of Google's deceptive statements, it would have halted its participation in the AdSense program and partnered up instead with other on-line advertising programs such as Adversal or Bidvertiser known to be honest and scrupulous with its publishers.  The $300,000 in costs spent by Super Cray would have led to increased user traffic for those alternate programs and Super Cray would be earning substantial monthly advertising revenue today from those programs instead of being on the verge of bankruptcy.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**

112.     Super Cray hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

113.     Super Cray entered into the AdSense Agreement with Google.

114.     Super Cray fully performed all of its obligations under the AdSense Agreement, as alleged herein and as confirmed by Google AdSense representatives Ryan J, Roy and Jacky G on September 29, 2014, twice on October 1, 2014 and on October 6, 2014.

115.     Super Cray's full performance is also evidenced by the fact that the advertising layouts used by SuperCrayCray were virtually identical to the advertising layouts used by AdSense publishers such as Answers.com, PressRoomVIP and UrbanTabloid, none of whom have been banned by Google for non-compliance with AdSense policies or have had a material amount of accrued AdSense earnings withheld for that reason.

116.     In breach of the AdSense Agreement, Google failed to pay Super Cray for the number of valid clicks on advertisements displayed on SuperCrayCray, the number of valid impressions of advertisements displayed on SuperCrayCray, and/or other valid events performed in connection with the display of advertisements on SuperCrayCray using Google's AdSense program.

117.     On information and belief, Google has not refunded to advertisers any of Super Cray's accrued AdSense earnings but has kept those earnings to itself, in further breach of the AdSense Agreement.

118.     As a proximate result of Google's breach of contract, Super Cray has been damaged of no less than $535,000.

119.     In addition, Google's breach of contract damaged Super Cray because it lost future profits as a result. Had Super Cray received its earnout as Google was contractually obligated to pay, it would have re-invested those earnings into driving even more user traffic to its website and would be earning substantial monthly advertising revenue today from other non-AdSense on-line advertising platforms instead of being on the verge of bankruptcy.

120.     Google was fully aware that its breach of contract could result in lost future profits for Super Cray. Google encourages its publishers to acquire additional user traffic by using advertising or partnering with traffic sites. Such efforts obviously come at a financial cost to the publisher and cannot be sustained if Google does not pay out the earnings derived from such investment of funds by the publisher.

## FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

121.     Super Cray hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

122.     Google has a duty under California law to act in good faith and deal fairly with Super Cray in connection with the parties' AdSense Agreement and its obligations in administering the AdSense advertising program.

123.     Google breached its duty of good faith and fair dealing by arbitrarily and capriciously terminating Super Cray's account and withholding its AdSense earnings even after Google AdSense representatives Ryan J, Roy and Jacky G had confirmed to Super Cray on September 29, 2014, twice on October 1, 2014 and on October 6, 2014 that it was fully complying with AdSense policies.

124.     Google breached its duty of good faith and fair dealing by refusing to provide a meaningful review of Super Cray's internal appeal to Google over its purported AdSense policy violation.  Google representatives steadfastly refused to allow Super Cray to speak in person with anyone at Google to present any kind of explanation, and Google representatives ignored the fact they had previously told Super Cray that it was complying with relevant AdSense policies.

125.     Google breached its duty of good faith and fair dealing by arbitrarily suspending Super Cray for purported violations of AdSense policies and withholding its accrued earnings, but not suspending or withholding any earnings from AdSense publishers with virtually identical advertising layouts such as Answers.com, PressRoomVIP and Urban Tabloid.

126.     Google breached its duty of good faith and fair dealings by providing purported examples of improper advertising layouts and then punishing AdSense publishers for formatting their websites in a manner to avoid the types of layouts Google told them not to use.

127.     As a proximate result of Google's breach of duty, Super Cray has been damaged of no less than $535,000.

128.     In addition, Google's breach of duty damaged Super Cray because it lost future profits as a result.  Had Super Cray received its earnout as Google was contractually obligated to pay, it would have re-invested those earnings into driving even more user traffic to its website and would be earning substantial monthly advertising revenue today from other non-AdSense advertising platforms instead of being on the verge of bankruptcy.

129.     Google was fully aware that its breach of duty could result in lost future profits for Super Cray.  Google encourages its publishers to acquire additional user traffic by using advertising or partnering with traffic sites.  Such efforts obviously come at a financial cost to the publisher and cannot be sustained if Google does not pay out the earnings derived from such investment of funds by the publisher.

## FIFTH CAUSE OF ACTION
### (Cal. Bus. & Prof. Code §§ 17200, et seq.)

130.     Super Cray hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

131.     Google's practices, as alleged herein, violate California Civil Code sections 1709 and 1710.

132.     Google engaged in these unlawful practices to the detriment of Super Cray for the purpose of increasing its profits.

133.     As a result of such unlawful actions, Super Cray has suffered and continues to suffer injury in fact and has lost money as a result of these practices.

134.     Super Cray seeks full restitution of monies, according to proof, acquired by Google from Super Cray by means of the unlawful practices alleged herein.

135.     Super Cray seeks an injunction to prohibit Google from continuing to engage in the unlawful practices alleged herein, in particular, Google's ongoing practice of having AdSense customer support representatives making representations to AdSense publishers as to whether those publishers are complying with AdSense policies, even though those representatives have no discretion to determine whether those publishers are complying with AdSense policies.

<u>**PRAYER**</u>

**WHEREFORE**, Plaintiff Super Cray Inc. prays for judgment as follows:

1.     For judgment against defendant Google Inc.;

2.     For compensatory damages;

3.     For punitive damages;

4.     For preliminary and permanent injunctive relief;

6.     For restitution;

7.     For pre-judgment interest;

8.     For costs; and

9.     For such other and further relief as the Court deems just and proper.

Dated:  March 19, 2015                    GAW | POE LLP


By:  _____
                                        Randolph Gaw
                                        Attorneys for Plaintiff Super Cray Inc.

**JURY DEMAND**

Plaintiff Super Cray Inc. hereby demands a jury trial for its claims against defendant Google Inc.

Dated:  March 19, 2015

GAW | POE LLP

By: _____

Randolph Gaw
Attorneys for Plaintiff Super Cray Inc.